**In re MEDICAR AMBULANCE COMPANY, INC., Debtor.**

**MEDICAR AMBULANCE COMPANY, INC., Plaintiff,**

v.

**Donna E. SHALALA, in her capacity as Secretary of the United States Department of Health and Human Services, Defendant.**

**Bankruptcy No. 93–51143–MM. Adv. No. 93–5153.**

United States Bankruptcy Court, N.D. California.

May 6, 1994.

as Secretary of the U.S. Dept. of Health and Human Services.

## OPINION

MARILYN MORGAN, Bankruptcy Judge.

### I. INTRODUCTION

The debtor, an ambulance service supplying transportation to Medicare patients seeks injunctive relief in this proceeding to prevent the Department of Health and Human Services ("HHS") from suspending payment of its Medicare reimbursements because of alleged overpayments. The facts require harmonization of two independent federal statutes. Because restructuring the debtor/creditor relationship is within the exclusive purview of the Bankruptcy Code and because the suspension violates the automatic stay without an applicable exception, the injunction is granted.

### II. FACTS

Medicar Ambulance Company, Inc. ("Medicar") is an ambulance service responding to emergency and routine transportation requests from hospitals and other medical facilities. It is a voluntary participant in the Medicare program, submitting claims as an assignee of patients who are beneficiaries under the Medicare program.

On December 8, 1992, Medicar was notified that further Medicare payments would be suspended because Blue Shield of California had determined that prior payments of Medicar were incorrect and that overpayments were suspected.[1] Two reasons were given for the suspension. First, Blue Shield's investigation had uncovered allegedly reliable evidence that Medicar had misrepresented services, such as routine, non-emergency transportation, as being compensable under the Medicare program. Second, the investigation had also produced allegedly reliable evidence that medical records were altered to justify the medical necessity for services that may not have been compensable. Blue Shield notified Medicar that sus-

Theresa L. Pfeiffer, Los Gatos, CA, for plaintiff Medicar Ambulance Co., Inc.

Mary F. Dooley, San Francisco, CA, for defendant Donna E. Shalala, in her capacity

1. In this geographical area, Medicare Part B claims are submitted to Blue Shield of California ("Blue Shield" or "carrier") which is a Medicare carrier with respect to Part B benefits. *See* 42 U.S.C. § 1395u(a); 42 C.F.R. § 421, Subparts A and C (1992). Medicare carriers act as the agents of the Health Care Financing Administration ("HCFA"), which is an operating component of HHS, in the administration of the Medicare program.

pended payments would be segregated in a suspense account for the duration of the investigation. At the conclusion of the investigation, the suspended payments would be applied to any overpayments which were determined to have actually occurred and any excess would be returned to Medicar.

Blue Shield was acting pursuant to federal regulations which allow Medicare payments to suppliers to be suspended, in whole or in part, when the carrier has determined, or there is reliable evidence, that there has been an overpayment. 42 C.F.R. § 405.-370(a) (1992). Suspensions may be imposed only after the carrier has determined that the suspension of payments is necessary to protect the program against financial loss. 42 C.F.R. § 405.370(b) (1992). Generally, a notice period is required before the suspension of payments may go into effect. 42 C.F.R. § 405.371(a) (1992). However, in cases where fraud or misrepresentation is suspected, notice may be provided concurrently with the suspension of payments. 42 C.F.R. § 405.371(b) (1992). Amounts withheld pursuant to a suspension are retained in a special suspense account. Once a suspension is in effect, it remains in effect until either the overpayment is returned, a liquidation agreement is reached with the supplier, or the agency determines that there was no overpayment. 42 C.F.R. § 405.373 (1992).

The first payment was withheld by Blue Shield on February 9, 1993.[2] Since that time, Medicar has continued to submit Medicare claims, but all payments pursuant to the claims have been placed in the suspense account. Medicar filed its chapter 11 petition on February 22, 1993. It is moving forward with its reorganization, having filed its plan and disclosure statement.

Blue Shield's Preliminary Notice of Audit Results alleged that Medicar had been overpaid approximately $2.7 million. Medicar has obtained several extensions of the date by which it must respond to this notice. When the response date has finally passed, determination of the overpayment will become final. A final determination of an over-

payment will trigger an appeals process, first within the HHS appeals system and then in federal court.

Medicar seeks injunctive relief to compel Blue Shield to discontinue its suspension of post-petition payments. It argues that the suspension is a violation of the automatic stay and that the monies withheld are necessary to fund its proposed plan of reorganization.

HHS contends that Medicar is attempting to use the bankruptcy process to avoid compliance with the laws governing the Medicare program, a result which Congress did not intend when drafting the Bankruptcy Code. HHS argues that it has a critical interest in maintaining the integrity of the Medicare program and that Congress has given it considerable discretion and authority to do so. It claims that if it is not allowed to suspend post-petition reimbursements, it will be unable to exercise its authority in a manner which will allow it to deter fraud by Medicare suppliers.

### III. ISSUE

The issues before the court on the parties' cross-motions for summary judgment are (1) whether, as a result of the automatic stay, Medicar is relieved of the Medicare regulations governing suspension of payments to suppliers; and, (2) whether an exception to the automatic stay allows the suspension of payments by HHS.

### IV. DISCUSSION

**A.** *As A Result Of The Automatic Stay, Medicar Is Relieved Of The Medicare Regulations Governing Suspension of Payments To Suppliers.*

1. **Judicial Review Is Required To Harmonize The Conflict Between The Suspension Provisions Of The Medicare Act And The Automatic Stay Provisions Of The Bankruptcy Code.**

Medicar, as a supplier under Part B of the Medicare Act, is not party to a contract with the Department of Health and Human Ser-

---

**2.** Medicar claims that the suspension commenced on March 16, 1993, after the bankruptcy filing. However, copies of canceled checks make it clear that payments were credited to the suspense account from February 9, 1993 and there-

after. Medicar has not submitted any evidence that it received Medicare payments that were not credited to the suspense account after February 9, 1993.

vices ("HHS").[3] Rather, the relationship of the parties is governed by the provisions of the statute and regulations. These regulations include provisions for suspension of payments during an investigation into alleged overpayments to a supplier. Because there is no agreement to be assumed under the bankruptcy laws, an analysis of contract assumption under 11 U.S.C. § 365[4] is not applicable,[5] nor is the doctrine of recoupment helpful.[6] Yet, the Medicare Act is a comprehensive statutory scheme which depends on suspension of payments as part of its enforcement mechanism.

■ By seeking the protections of the Bankruptcy Code, Medicar is avoiding the rigors of the marketplace, effectively asserting that the automatic stay allows Medicar to receive payments that it would not be entitled to receive outside the bankruptcy forum. Such a result is contrary to Congressional intent in creating the Bankruptcy Code. "Congress has repeatedly expressed its legislative determination that the trustee ... is not to have *carte blanche* to ignore nonbankruptcy law." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 502, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). A debtor in possession is not relieved of all obligations under a non-bankruptcy statute "simply by filing a petition for bankruptcy." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 534, 104 S.Ct. 1188, 1200, 79 L.Ed.2d 482 (1984).

■ When faced with two competing statutory schemes, the court is challenged to harmonize the policies and goals of both statutes. *Bildisco,* 465 U.S. at 527, 104 S.Ct. at 1196. Reconciling the suspension of payments under the Medicare Act with the automatic stay of the Bankruptcy Code requires that the court define the appropriate postpetition relationship between a debtor and the government in a manner which respects "the fundamental concerns of each." *In re University Medical Ctr.,* 973 F.2d 1065, 1083 (3d Cir.1992).

■ The court acknowledges that substantial deference should be accorded the administrative agency charged with implementing a body of law.[7] Congress has

---

3. The intersection between Part A of the Medicare Act and the Bankruptcy Code has been considered by numerous other courts. *See In re University Medical Ctr.,* 973 F.2d 1065 (3d Cir. 1992); *In re Metropolitan Hosp.,* 131 B.R. 283 (E.D.Pa.1991); *Matter of Visiting Nurse Ass'n of Tampa Bay, Inc.,* 121 B.R. 114 (Bankr.M.D.Fla. 1990); *In re Tidewater Memorial Hosp., Inc.,* 106 B.R. 876 (Bankr.E.D.Va.1989); *In re Advanced Professional Home Health Care Inc.,* 94 B.R. 95 (E.D.Mich.1988); *In re Memorial Hosp. of Iowa County, Inc.,* 82 B.R. 478 (W.D.Wis.1988); *In re Yonkers Hamilton Sanitarium Inc.,* 34 B.R. 385 (S.D.N.Y.1983). These cases are not applicable, however, because Part A providers operate under a contract which allows for recovery of past overpayments through suspension of current payments. The courts deciding these cases focused on whether the contract had been assumed post-petition and, if it had not been assumed, whether the doctrine of recoupment was nonetheless applicable. There are no published opinions considering the issues under Part B of the Medicare Act.

4. Unless otherwise indicated, all references to code sections are to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

5. Section 365 incorporates the common law requirement that the debtor must accept the burdens as well as the benefits of the contract. *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir.1985). Thus, in order to receive payments under the contract with HHS, a Medicare Part A provider would be required to assume the burden of contractually provided recoupment.

6. For the doctrine of recoupment to be applicable, the claims must involve the same transaction or occurrence. *In re California Canners & Growers,* 62 B.R. 18 (Bankr. 9th Cir.BAP 1986). In *California Canners* the court held that the same transaction and occurrence requirement is not met simply because both claims arise under a single contract or relationship involving a series of distinct transactions. The same transaction requirement is met only if both claims are based on exactly the same deal between the parties. *Id.* Although its reimbursement is governed by an overarching series of regulations, Medicar is paid separately for each invoice it submits to Blue Shield. Because each invoice and reimbursement constitutes a separate transaction under the *California Canners* definition, the doctrine of recoupment is not applicable.

7. Two reasons are advanced for this deference. First, the agency is assumed to have expertise in the area. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Secondly, the administrative agency is considered to be politically accountable to the electorate. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 865–66, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984).

charged HHS with implementing the Medicare Act. However, administrative action against a debtor may proceed after the filing of a bankruptcy petition so long as it does not interfere with the reorganization process. *Board of Governors v. Mcorp Fin.,* — U.S. —, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). This rule gives full respect to the expertise and accountability of an administrative agency without contravening the policies of the Bankruptcy Code.[8]

The determination of the existence and amount of alleged overpayments arguably requires the expertise and accountability of the agency charged with implementing the Medicare Act. This determination by HHS does not interfere with the reorganization process and is clearly within the rule announced by *Mcorp.* However, the suspension of payments to a debtor does interfere with the reorganization process. Moreover, reconciliation of a regulation providing for the suspension of payments with a statute providing for an automatic stay is not dependent upon any fact finding, agency expertise, or accountability. Instead, it is a judicial function to harmonize the scope of independent federal statutes and regulations. Therefore, the intersection between the Medicare Act and the Bankruptcy Code requires judicial review of the goals and functions of each statute.

## 2. The Goal Of The Medicare System Is To Make Adequate Medical Treatment Available To The Aged And Disabled.

After extensive study, Congress concluded that federal legislation was needed to protect the nation's elderly citizens against the costs of medical care. As a result, in 1960, Congress enacted the Kerr–Mills program to meet this need. S.Rep. No. 404, 98th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1964. After five years of further study, Congress enacted a series of amendments and extensions which became popularly known as the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* These amendments were enacted to ensure adequate health care for the elderly. The amendments were intended to extend the effectiveness of the Kerr–Mills program by providing

a coordinated approach for health insurance and medical care for the aged under the Social Security Act. This was to be effected through an expanded medical assistance program for the needy and medically needy aged, blind and disabled.

S.Rep. No. 404, 98th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1964.

---

**8.** The automatic stay is not the only way in which the Bankruptcy Code protects the process of reorganizing or liquidating the debtor. Numerous cases have held a regulatory action which threatens the reorganization may be restrained under § 105. *See NLRB v. Superior Forwarding, Inc.,* 762 F.2d 695 (8th Cir.1985) (court may enjoin NLRB proceedings which threaten assets of the estate); *Securities and Exchange Comm'n v. First Fin. Group,* 645 F.2d 429, 444 (5th Cir.1981) (court could enjoin appointment of a receiver pursuant to SEC regulations to the extent appointment threatened assets of the estate); *In re Public Serv. Co. of New Hampshire,* 108 B.R. 854, 892 (Bankr.D.N.H.1989) (under limited circumstances, plan of reorganization can preempt statutes requiring state agency approval of restructuring of public utility); *In re Hunt,* 93 B.R. 484 (Bankr.N.D.Tex.1988) (court may enjoin CFTC action to impose monetary penalties against debtors for violations of Commodity Exchange Act when penalties would disrupt court's ability to effectively manage debtor's reorganization); *In re Chateaugay Corp.,* 93 B.R. 26, 29 (S.D.N.Y. 1988) (court could enjoin action in another court to determine state tax liability); *In re Sam Daily Realty, Inc.,* 57 B.R. 83 (Bankr.D.Haw.1985) (court could enjoin state agency from enforcing a

money judgment for pre-petition violations if injunction was necessary to avoid preferential treatment of agency and to provide for orderly distribution to all creditors).

Other cases have held that restraint of the regulatory action might be appropriate except for the facts of the case. *See Matter of Commonwealth Oil Ref. Co.,* 805 F.2d 1175 (5th Cir.1986) (EPA action not stayed because debtor was not likely to succeed on the merits), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *In re Compton Corp.,* 90 B.R. 798 (N.D.Tex.1988) (no harm to estate in DOE administrative proceeding to liquidate, but not enforce, a claim for oil price overcharge); *In re Rabzak,* 79 B.R. 966 (Bankr.E.D.Pa.1987) (action against debtor for enforcement of municipal rubbish ordinance not stayed because no adverse impact on the estate was shown); *In re Security Gas & Oil, Inc.,* 70 B.R. 786 (Bankr.N.D.Cal. 1987) (enforcement of state environmental laws not stayed because debtor failed to address factors necessary for granting injunctive relief); *In re Wengert Transp., Inc.,* 59 B.R. 226 (Bankr. N.D.Iowa 1986) (injunction denied because no harm shown in allowing state transportation agency proceedings to go forward).

■ Administrative rules and regulations relating to the Medicare system are codified at 42 C.F.R. §§ 400 *et seq.* (1992). Among other things, these regulations provide a detailed scheme for agency review of supplier's compliance with requirements for reimbursement of Medicare suppliers. In order to prevent fraud and protect the fiscal integrity of the Medicare system, the regulatory scheme allows for the suspension of payment when prior overpayments to a supplier are suspected. The statutes and regulations support Medicare's fundamental purpose of providing adequate medical treatment to the elderly and disabled by protecting the fiscal integrity of the system.

### 3. The Goal Of The Bankruptcy Code Is To Enhance Return To Creditors Through Rehabilitation And Orderly Liquidation.

■ The primary purposes of Chapter 11 of the Bankruptcy Code are successful reorganization of the debtor and maximization of the value of the estate. *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993) (citing *Bildisco,* 465 U.S. at 527, 104 S.Ct. at 1196 and *Toibb v. Radloff,* 501 U.S. 157, 163–65, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991)). By preventing a Chapter 7 liquidation, a Chapter 11 reorganization avoids the resulting negative impact on jobs, suppliers of the business, and the economy as a whole. *Bonner Mall,* 2 F.3d at 915 (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983)).

In order to achieve the goals of Chapter 11, bankruptcy alters the rules governing the non-bankruptcy relationships between a debtor and its creditors. The creditor is limited in the methods it may use to collect a debt and the debtor is limited in those debts it may repay. These limitations may be explained as a set of rules that creditors would agree upon were they able to do so. Thomas H. Jackson, *Logic and Limits of Bankruptcy Law* (1986).

■ Without some mechanism to restrain them, creditors will act to collect from a debtor at the first sign of financial difficulty. The theory is that:

a costly "race to the courthouse" would develop, with each creditor rushing to enforce its collection rights at the first sign

of trouble, lest other creditors get there first and levy on all of the debtor's available assets. In their zeal to ensure satisfaction of their particular debts, the creditors might dismember a debtor that, on reflection, all would agree is worth more to the creditors collectively as a going concern.

David A. Skeel, *Markets, Courts, and the Brave New World of Bankruptcy Theory,* 1993 Wis.L.R. 465 (1993) (citations omitted). By preventing a race to the courthouse, bankruptcy results in either a reorganization or an orderly liquidation of the debtor which will benefit all creditors.

According to the terms of the bargain, the variety of individual collection methods is replaced by a collective proceeding—bankruptcy—that allows creditors to overcome the collective action problem. Bankruptcy forces creditors into a single forum where, as a group, they can decide the debtor's future. Assuming it is properly structured, this collective proceeding maximizes the return to the creditors as a group. The race to the assets of state law is replaced by reasoned decisionmaking.

Robert Kenneth Rasmussen, *Bankruptcy and the Administrative State,* 42 Hastings L.J. 1567, 1574–75 (1991) (citations omitted). However, bankruptcy should not alter state or other nonbankruptcy law any more than necessary to prevent the race to the courthouse. Thomas H. Jackson, *Bankruptcy, Non–Bankruptcy Entitlements, and the Creditors' Bargain,* 91 Yale L.J. 857 (1982).

■ The concept of the creditor's bargain is important in understanding the *quid pro quo* of the automatic stay. The filing of a bankruptcy petition operates to stay "the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case." § 362(a)(1). It also bars any attempt to obtain property of the estate or collect a debt which arose prepetition. § 362(a)(6). In the Ninth Circuit, actions taken in violation of the automatic stay are void, not voidable. *In re Schwartz,* 954 F.2d 569, 571 (9th Cir.1992).

The automatic stay is one of the fundamental protections provided by the Bankruptcy Code.[9] In addition to protecting debtors, the automatic stay protects individual creditors from all creditors as a collective body.

> Without [the stay], certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of their claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents this.

H.R.Rep. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787. Congress subjected all creditors, both public and private, to the limitations of the automatic stay,[10] which is designed to protect the relative positions of all creditors. *In re Glasply Marine Indus., Inc.*, 971 F.2d 391, 394 (9th Cir.1992).

> Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

S.Rep. No. 989, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5838. By limiting the actions of all creditors, the automatic stay effectuates the creditors' bargain.

### 4. Harmonization Requires Respect for the Fundamental Purposes of Each Statute.

■ To summarize the functions and goals of each of the intersecting statutes, the suspension of payments by HHS is a regulatory mechanism to deter fraud and protect the fiscal integrity of the Medicare system, thereby maximizing medical benefits to needy senior citizens. The automatic stay is a statutory mechanism to deter individual creditor action, thereby enhancing successful reorganization and maximizing the return to creditors collectively. In defining a post-petition relationship between the debtor and the government which "respects the fundamental concerns of each," *University Medical Ctr.*, 973 F.2d at 1082–83, it is evident that matters integral to the restructuring of the debtor/creditor relationship are within the purview of the Bankruptcy Court. *See Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 57–58, 109 S.Ct. 2782, 2798–99, 106 L.Ed.2d 26 (1989). Where reconciliation of the objectives of the Bankruptcy Code with those of another statutory scheme reveals that the effect of the non-bankruptcy statute is to restructure the debtor/creditor relationship rather than advance its own fundamental concerns, the intersecting non-bankruptcy statute must yield to the Bankruptcy Code.

■ On the one hand, if the court were to allow the suspension of payments by HHS to continue, the bankruptcy goals would be eviscerated: reorganization would be jeopardized, maximum value could not be obtained for the collective creditor body, and the government would become a preferred creditor. The Medicare goals of deterring fraud would only be achieved at the price of potentially eliminating a health care supplier from the marketplace before final determination of an overpayment is reached. On the other hand, if the court applies the automatic stay and terminates the suspension by HHS, the essential purposes of both statutes are achieved: medical benefits are made available to needy senior citizens; the bankruptcy goals of reorganization and maximizing value to creditors remain intact. This result may require that HHS use other tools available to it to protect the fiscal integrity of the Medicare system.

---

**9.** The automatic stay

gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787.

**10.** By its terms, § 362(a) applies to "all entities." § 362(a). The Bankruptcy Code defines the term "entity" as including governmental units. § 101(14). *See e.g., In re Pearson*, 917 F.2d 1215, 1216 (9th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992).

Enforcing the automatic stay does not strip HHS of its protection against fraud or necessarily make the Bankruptcy Court a "haven for dishonest debtors and wrong-doers." *Commodity Futures Trading Comm'n v. Co Petro Mktg.*, 700 F.2d 1279, 1283 (9th Cir.1983). The Bankruptcy Code provides a variety of safeguards against fraudulent conduct by a debtor. Among these are the debtor's fiduciary responsibilities to creditors, the fact that the debtor's conduct can be monitored by 2004 examinations, the requirement that monthly operating reports be submitted to the court and made available to creditors, and the requirement that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." § 1129(a)(3). Additionally, to protect the public health, safety, and welfare, the Bankruptcy Code provides the police and regulatory power exception to the automatic stay. §§ 362(b)(4)–(5).

**B.** *No Exception To The Automatic Stay Allows The Suspension Of Payments By HHS.*

**1. The Governmental Unit Exception To The Automatic Stay Is Limited To Actions Which Protect The Public Health, Morals, And Safety.**

 Not all actions are barred by the automatic stay. A number of statutory exceptions to the stay exist; however, these exceptions are interpreted narrowly in order to further the automatic stay's purpose of protecting all creditors. *Glasply Marine*, 971 F.2d at 394–95.

Section 362(b)(4) provides that the automatic stay does not reach "the commencement or continuation of an action or proceeding by a governmental unit's police or regulatory power." § 362(b)(4). Courts have developed two tests to determine whether a governmental proceeding falls within the police or regulatory power exception. *NLRB v. Continental Hagen Corp.*, 932 F.2d 828, 833–34 (9th Cir.1991). These tests, known as the pecuniary purpose test and the public policy test, are opposite sides of the same coin. Most courts apply both tests and reach

the same conclusion no matter which test is used. *See, e.g., Continental Hagen Corp.*, 932 F.2d at 833–35.

 The pecuniary purpose test has its origin in remarks made by Senator DeConcini and Representative Edwards during the passage of the Bankruptcy Code.[11] The legislators asserted that the police power exception "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 124 Cong.Rec. S17,-406 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6513; 124 Cong.Rec. H11,089 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6444–45. Under the pecuniary purpose test, the language of the police and regulatory power exception allows the "enforcement of state laws affecting health, morals, and safety but not regulatory laws that directly conflict with the bankruptcy court's control of the property of the estate." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 591 (9th Cir.1993) (adopting the holding of *Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 775–77 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982)).

 The public policy test distinguishes between proceedings that effectuate public policy and those that adjudicate private rights. Only the former are exempted from the automatic stay. *Continental Hagen Corp.*, 932 F.2d at 833–34; *Eddleman v. United States Dep't of Labor*, 923 F.2d 782, 790–91 (10th Cir.1991); *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 941–43 (6th Cir.1986). A governmental unit cannot escape the automatic stay by adjudicating the private rights of its citizens under the guise of public protection. *In re Herman*, 160 B.R. 780, 783 (E.D.La.1993) (citing *In re Charter First Mortgage, Inc.*, 42 B.R. 380, 383–84 (Bankr.D.Ore.1984)). In applying the public policy test a court must determine

---

**11.** The floor statements of Representative Edwards and Senator DeConcini are considered highly persuasive. *Begier v. Internal Revenue*

*Serv.*, 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 2266 n. 5, 110 L.Ed.2d 46 (1990).

whether the action is an attempt to prevent future violations of the law rather than an attempt to determine the liability of private parties. *Id.* Thus, under the public policy test, an action to revoke a contractor's license is allowed to proceed, despite the automatic stay, because it enforces a public policy. However, attempts to collect monies owed to persons harmed by the same incidents which caused the revocation proceedings enforce a private right, and thus violate the automatic stay. *In re Poule,* 91 B.R. 83 (Bankr. 9th Cir. BAP 1988).

The suspension of Medicare payments is not exempted under either test. Applying the pecuniary purpose test, HHS concedes that the suspended payments are property of the estate. Enforcement of the suspension directly and impermissibly conflicts with the court's control of property of the estate. Under the public policy test, HHS would be allowed to take actions to fix the amount of civil penalties or to determine Medicar's continued eligibility to participate in the Medicare system since these actions enforce public policy, not private rights. However, inasmuch as the suspension is an attempt to enforce a monetary claim, it exceeds the scope of the police power exception no matter which test is used.

Under both the pecuniary purpose and public policy tests, numerous cases have upheld the government's right to take regulatory actions which determine monetary penalties. *Continental Hagen Corp.,* 932 F.2d at 833–34; *NLRB v. P*I*E Nationwide, Inc.,* 923 F.2d 506, 512 (7th Cir.1991); *Eddleman,* 923 F.2d at 790–91; *Edward Cooper Painting,* 804 F.2d at 941–43; *Penn Terra Ltd. v. Department of Envtl. Resources,* 733 F.2d 267, 275 (3d Cir.1984). These same cases hold that, while the police power exception allows an agency to seek entry of judgment, § 362(b)(5) precludes enforcement of a money judgment. The Ninth Circuit explained that

[q]uite separate from the entry of a money judgment, however, is a proceeding to enforce that money judgment. The paradigm for such a proceeding is when, having obtained a judgment for a sum certain, a plaintiff attempts to seize property of the defendant in order to satisfy that judgment. It is this seizure of a defendant-debtor's property, to satisfy the judgment obtained by a plaintiff-creditor which is proscribed by subsection 362(b)(5).

*Continental Hagen Corp.,* 932 F.2d at 834 (citing *Penn Terra,* 733 F.2d at 275). A regulatory action is not impermissible merely because it seeks a money judgment or because it may result in the need for the debtor to expend funds. However, an attempt to enforce a judgment or seize the property of the estate is impermissible. The suspension of payments by HHS is, from the debtor's perspective, the equivalent of the seizure of property or the enforcement of a judgment.

### 2. Preserving the "Status Quo" Violates the Automatic Stay.

■ Alternatively, HHS argues that there is no violation of the automatic stay because the suspension of payments commenced before Medicar filed its bankruptcy petition. It cites *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 585 (9th Cir.1993), for the proposition that the automatic stay operates to preserve the *status quo.* HHS argues that because Medicar was not in "payment status" at the time it filed for bankruptcy, the suspension of payments merely continued the pre-petition *status quo* in this case. Therefore, it claims that there has been no violation of the automatic stay.

However, reading the Ninth Circuit's cited statement in context, it is clear that the Court is reiterating that the automatic stay protects creditors by replacing the "unfair race to the courthouse" with orderly liquidation that treats all creditors equally.[12]

---

12. When a debtor files a bankruptcy petition, an automatic stay immediately arises. The scope of the stay is quite broad. It is designed to effect an immediate freeze of the *status quo* by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy fora against the debtor or affecting the property of the estate. The automatic stay plays a vital and fundamental role in bankruptcy. The stay ensures that all claims against the debtor will be brought in a single forum, the bankruptcy court. The stay protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others.
*Hillis Motors,* 997 F.2d at 585 (citations omitted).

Courts have held that the suspension of payments that a debtor would otherwise be entitled to receive from a government agency is a violation of the automatic stay in a number of contexts. *See University Medical Ctr.,* 973 F.2d at 1084 (suspension of payments to Part A Medicare provider violated the automatic stay); *Tidewater Memorial Hosp.,* 106 B.R. at 882 (same); *Memorial Hosp. of Iowa County,* 82 B.R. at 484 (same); *Small Business Admin. v. Rinehart,* 887 F.2d 165, 168 (8th Cir.1989) (SBA hold on debtor's funds violated the stay even though the funds were being placed in a suspense account and not actually being applied to indebtedness); *United States v. Reynolds,* 764 F.2d 1004, 1007 (4th Cir.1985) (IRS retention of debtors' tax refund was a setoff which violated the automatic stay); *United States v. Norton,* 717 F.2d 767, 773 (3d Cir.1983) (IRS must petition court for relief from automatic stay before exercising any setoff rights available to it); *In re Mohar,* 140 B.R. 273 (Bankr. D.Mont.1992) (SBA's "administrative hold" is an act to exercise control over property of the estate which violates the automatic stay, even if the offset is valid). Rather than maintaining the *status quo,* the suspension of payments by HHS is precisely the type of preferential treatment the automatic stay is intended to prevent.

## V. CONCLUSION

Medicar's motion for summary judgment is granted. Blue Shield is ordered to discontinue its suspension of payments and to turn over to Medicar all amounts placed in the suspense account since February 8, 1993. The government's cross-motion for summary judgment is denied.