In re P.K.R. CONVALESCENT CENTERS, INC., Debtor.

P.K.R. CONVALESCENT CENTERS, INC. and Emporia Health Investors, L.C., Plaintiffs,

v.

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MEDICAL ASSISTANCE SERVICE, Defendant.

Bankruptcy No. 95–30077–T.
Adv. No. 95–3056–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Sept. 21, 1995.

Roy V. Creasy, Roanoke, VA, for debtor.

John T. Arnold, Roanoke, VA, for Emporia Health Investors, L.C.

Henry C. Su, Richmond, VA, for DMAS.

Gregg R. Nivala, Office of United States Trustee, Richmond, VA.

John D. McIntyre, Norfolk, VA, for Essex Savings Bank.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

Trial was held July 14, 1995, on the complaint of P.K.R. Convalescent Centers, Inc., and Emporia Health Investors, L.C., for declaratory judgment and injunctive relief. Plaintiffs seek an injunction against the Commonwealth of Virginia, Department of Medical Assistance Service, prohibiting DMAS from pursuing collections against a prospective purchaser of estate property after a sale is executed pursuant to 11 U.S.C. § 363(f). Plaintiffs allege that section 32.1–329 of the Virginia Code, which grants DMAS the authority to recapture depreciation from the purchaser, is preempted by the Bankruptcy Code. Accordingly, plaintiffs request that the court enjoin DMAS pursuant to 11 U.S.C. § 105(a). The court took the matter under advisement. Given the unique circumstances of this case, the court will exercise its equitable powers under § 105(a) and grant the requested injunction.

## FACTS [1]

On January 6, 1995, debtor P.K.R. Convalescent Centers, Inc., filed a good-faith, chapter 11 bankruptcy petition.

Debtor operates a nursing home facility with 120 beds and ten adult care beds in Emporia, Virginia, a rural area with a high poverty rate. The facility has for the last five years had an average annual occupancy rate of 95% of which 93% are Medicaid patients. The average age of the patients is seventy-eight years. There are four other nursing homes within a thirty mile radius of the facility which have an average annual occupancy rate of 90%.

The real property is secured by four deeds of trust with the respective current balances:

(1) First deed of trust to First Virginia Bank—approximately $900,000.00;

(2) Second and third deeds of trust to the R. Kevin Adams Family—approximately $1,800,000.00; and

(3) Fourth deed of trust to Essex Savings Bank—approximately $610,000.00.

In addition, there is a federal tax lien against the property in the approximate amount of $775,000.00.

The appraised value of the property is $3,425,000.00.

The facility provides services on behalf of the Virginia Medical Assistance Program, which is Virginia's Medicaid Program. The program is established pursuant to the Social Security Act, 42 U.S.C. § 1396a, and the program is administered by the Virginia Department of Medical Assistance Service in cooperation with the Department of Social Services and the federal government.

In accordance with the Virginia Medical Assistance Program, DMAS paid debtor, as a reasonable cost of debtor's providing services to the program, a certain amount of depreciation on the real property of the facility. Any depreciation previously paid to the debtor is subject to recapture by DMAS upon a transfer of the property if the purchase price of the property exceeds debtor's depreciated cost basis. Va.Code Ann. § 32.1–329 (Michie 1992). In essence, debtor must reimburse DMAS for the amount of depreciation previously allowed as a reasonable cost of providing services to the program if debtor realizes a gain on the sale of the property. If debtor fails to reimburse DMAS for the recapture depreciation, DMAS may, under section 32.1–329 of the Virginia Code, collect it by any means available by law, including a setoff against future Medicaid reimbursement to be paid to the purchaser of the facility under the program. The state of Virginia determines the amount of Medicaid reimbursement that will be available to a purchaser who continues to operate the facility as a nursing home

---

1. The parties did not present any evidence at the trial. Instead, the parties stipulated many facts as stated in this section. Other facts are not contested.

by first calculating a Medical Liability Asset Basis for the purchaser (not necessarily the purchase price). The rate of reimbursement is then based on this Medical Liability Asset Basis.

Thus, DMAS holds a contingent claim against debtor's estate tied to a sale of the property if debtor realizes a gain from the proposed sale. DMAS's contingent claim against debtor's estate is not secured by any lien on the property. DMAS's claim against the purchaser is derived from its claim against the bankruptcy estate.

On April 28, 1995, debtor moved to sell the facility outside of the ordinary course of business, free and clear of liens, claims, encumbrances, and interests pursuant to 11 U.S.C. § 363(f). Debtor and Emporia entered into an asset purchase agreement for the purchase of the property for $3,445,000.00. The price is based on a Medicaid Liability Asset Basis of $3,233,100.00 with the remainder being paid in cash by the purchaser.[2] Debtor has been attempting to sell the property since August 1991, and the only interested purchaser who has submitted an asset purchase agreement has been Emporia.

In fact, because of debtor's continuous financial deterioration, representatives of debtor, Emporia, and DMAS had met prepetition at various times in 1994 to negotiate an acceptable basis whereby the property could be sold as an on-going business without resorting to bankruptcy. On September 9, 1994, DMAS notified debtor that debtor would be in a better position to sell the property through the bankruptcy process as no determination of the final amount of depreciation recapture could yet be made.

DMAS has now determined that the depreciation recapture on the sale of the property at the agreement price will be approximately $1,700,000.00 which is due within thirty days of the pending sale. DMAS filed an unsecured non-priority proof of claim in the amount of $1,779,395.00.

All secured creditors consented to the sale. An unsecured creditor and the Internal Revenue Service also consented to the sale. However, DMAS objected to the sale, alleging that the sale was not permissible under § 363(f). At a hearing on the motion, DMAS withdrew its objection and agreed that the motion could be approved subject to the rights of DMAS under Va.Code Ann. § 32.1–329 as determined by this court in this adversary proceeding.

On June 28, 1995, this court entered an order, which was endorsed by counsel for DMAS, approving the motion to sell pursuant to § 363(f).

Emporia is unable to consummate the sale for the price set out if DMAS is able to collect its claim from Emporia.

In addition, the Commonwealth of Virginia has placed a legislative moratorium on the construction of any new nursing home beds or expansion of any existing nursing home facilities until June 30, 1996, unless expressly excepted pursuant to Va.Code Ann. § 32.1–102.3:2.

Conversion of this case to chapter 7 may cause closure of the nursing home facility, and the closure of the facility will result in the involuntary discharge of those residents from the facility.

### POSITION OF THE PARTIES

Plaintiffs seek a declaratory judgment stating that section 32.1–329 of the Virginia Code must yield to the Bankruptcy Code because DMAS's collection efforts thereunder would restructure debtor-creditor relationships rather than advancing the fundamental purpose of Medicaid to make medical benefits available for needy senior citizens. In essence, plaintiffs argue that the Bankruptcy Code preempts section 32.1–329 of the Virginia Code insofar as estate property is concerned. Therefore, pursuant to 11 U.S.C. § 105(a), plaintiffs seek to enjoin DMAS

---

**2.** DMAS has basically set a ceiling on the sale price with its determination of the Medicaid Liability Asset Basis of $3,233,100.00. Debtor represented, and DMAS did not dispute, that the sale price was initially almost one million dollars higher. Apparently, the price was decreased because DMAS would not allow a Medicaid Liability Asset Basis of greater than $3,233,100.00, and Emporia cannot find a lender willing to finance any amount greater than the Medicaid Liability Asset Basis.

from pursuing collections against Emporia after the sale has been executed pursuant to § 363(f).

DMAS argues that the Bankruptcy Code does not preempt section 32.1–329 of the Virginia Code because section 32.1–329 does not conflict with 11 U.S.C. § 363 or any other provision of the Bankruptcy Code. Accordingly, DMAS argues that this court is without the equitable jurisdiction under § 105(a) to grant the requested injunctive relief.

## DISCUSSION AND CONCLUSIONS OF LAW

### PREEMPTION

■ Under the Supremacy Clause of the United States Constitution, federal law preempts state law if:

(1) Congress has expressly provided preemptive language in the federal statute in question; *See Jones v. Rath Packing Co.,* 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604] (1977);

(2) Congress' intent to preempt state law is implicit in a " 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' because 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.' " *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] (1982) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947)); or

(3) An actual conflict exists when " 'compliance with both federal and state regulations is a physical impossibility,' " or if state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.' " *Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 713 [105 S.Ct. 2371, 2375, 85 L.Ed.2d 714] (1985) (quoting

*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43 [83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248] (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)). In addition, the court can look to the actual wording of the federal statute to determine whether a conflict exists. *Michigan Canners and Freezers Assoc., Inc. v. Agricultural Mktg. and Bargaining Bd.,* 467 U.S. 461, 470 [104 S.Ct. 2518, 2523, 81 L.Ed.2d 399] (1984).

Congress did not place preemptive language in the Bankruptcy Code, nor did Congress intend that the Bankruptcy Code be so pervasive that it occupy the field of debtor/creditor relations. Therefore, in order for this court to conclude that the Bankruptcy Code preempts the Virginia law, the court must conclude that an actual conflict exists between a specific provision of the Bankruptcy Code and section 32.1–329 of the Virginia Code. *See Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.),* 35 F.3d 1348, 1353 (9th Cir.1994). Furthermore, "[s]imply making a reorganization more difficult for a particular debtor ... does not rise to the level of 'stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress' " *In re Baker & Drake, Inc.,* 35 F.3d at 1354 (quoting *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988) (footnote omitted)).

An actual conflict exists between 11 U.S.C. § 363(f) and section 32.1–329 of the Virginia Code as demonstrated by the wording of § 363(f). Pursuant to the Bankruptcy Code,

The trustee may sell property under subsection (b) [other than in ordinary course of business] or (c) [ordinary course of business] of this section *free and clear* of *any interest* in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be

sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; *or*

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).

As the plain meaning of the statute demonstrates, § 363 covers more situations than just sales involving liens. *See also In re Beker Indus. Corp.*, 63 B.R. 474, 478 (Bankr. S.D.N.Y.1986); *Connolly v. Nuthatch Hill Assocs. (In re Manning)*, 37 B.R. 755, 759 (Bankr.D.Colo.1984), *aff'd in part, vacated in part*, 831 F.2d 205 (10th Cir.1987). Section 363(f) addresses sales free and clear of *any interest*. *In re Manning*, 37 B.R. at 759 (emphasis added).

DMAS holds a contingent claim against debtor's estate tied to a sale of the property if debtor realizes a gain from the proposed sale. As part of this interest against the property, if debtor fails to reimburse DMAS for the recaptured depreciation under section 32.1–329 of the Virginia Code, DMAS may collect from Emporia, the proposed transferee. Thus, DMAS's interest is an interest that is subject to being sold free and clear of that interest if one of the five conditions under § 363(f) can be met. *See generally In re Welker*, 163 B.R. 488, 489 (Bankr.N.D.Tex. 1994) (addressing whether HUD regulatory procedures are interests that are subject to provisions of § 363); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr.S.D.N.Y.1992) (examining whether apartment building could be sold free and clear of Tenants' rights as established under two New York City Civil Court stipulated settlements); *In re 523 E. Fifth St. Hous. Preservation Dev. Fund Corp.*, 79 B.R. 568, 576 (Bankr.S.D.N.Y.1987) (addressing whether covenant requiring property to be used solely for low-income housing is interest that is subject to the provisions of § 363(f)).

The first four provisions of § 363(f) are not met in the instant case; applicable nonbankruptcy law does not permit the sale of such property free and clear of DMAS's interest, DMAS does not consent, DMAS's interest is not a lien, and DMAS's interest is not in bona fide dispute.

However, DMAS could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. DMAS's interest would be extinguished if it received $1,700,000.00 in depreciation recapture.

In addition to the plain language of the statute, an examination of the legislative history demonstrates that § 363(f)(5) applies to the proposed sale in this case. A sale under this section is free and clear of *any* interest if the entity "could be compelled to accept a money satisfaction of the interest in a legal or equitable proceeding. Sale under this subsection is subject to the adequate protection requirement." H.R.Rep. No. 595, 95th Cong., 2d Sess. 345 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6302. "Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale." S.Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5842.

Any claim that DMAS may acquire against Emporia is derived from its interest in the property. Under a § 363(f) sale, the purchaser acquires the property free and clear of all interests. Thus, the sale extinguishes DMAS's interest in the property because DMAS's interest attaches to the proceeds of the sale.[3] DMAS's derivative claim against Emporia for depreciation recapture is extinguished under § 363(f). And, the authority to collect against Emporia pursuant to section 32.1–329 of the Virginia Code is in direct conflict with the free and clear provision of 11 U.S.C. § 363(f).

DMAS argues that its interest is regulatory and not pecuniary. Even assuming that the interest is regulatory, the court does not see this as a dispositive distinction. The focus is on whether the interest could be

---

**3.** The court realizes that there will not be enough sale proceeds to cover DMAS's claim in bankruptcy. However, the nature of adequate protection depends on the nature of the interest. DMAS does not have a lien against the property; rather, DMAS possesses a contingent, unsecured, nonpriority claim. All claims against the estate are not necessarily satisfied in bankruptcy.

released with a money satisfaction and thus fall under the authority of § 363(f)(5). The cases cited by DMAS involve regulatory interests which cannot be satisfied with a money judgment.

For example, in support of its position, DMAS relies on the case of *In re Welker,* 163 B.R. 488, 489 (Bankr.N.D.Tex.1994). I find that not only is *In re Welker* distinguishable from the facts at issue, but I also find that *In re Welker* is contrary to DMAS's position. In *In re Welker* the court considered whether the trustee could sell free and clear of HUD's interest under a regulatory agreement which bound the owner of the project to maintain the low-income status of the project. The court concluded that "[n]o subsection of § 363 applies to authorize the trustee to sell free and clear of those interests." Unlike the facts in the case before me, the conditions referred to in the regulatory agreement were not interests that could be released with a money satisfaction.

DMAS also argues that section 32.1–329 is consistent with the Social Security Act and is therefore not preempted by the Bankruptcy Code. Although federal law provides a framework for the construction of state reimbursement programs, a depreciation recapture system is not required. Indeed, only a small minority of states has instituted such a depreciation system. Furthermore, even assuming a conflict existed between Medicare payments under the Social Security Act and the Bankruptcy Code, "if the effect of the non-bankruptcy statute is to restructure the debtor/creditor relationship rather than advance its own fundamental concerns, the intersecting non-bankruptcy statute must yield to the Bankruptcy Code." *Medicar Ambulance Co. v. Shalala (In re Medicar Ambulance Co.),* 166 B.R. 918, 925 (Bankr.N.D.Cal. 1994).

Finally, DMAS argues that section 32.1–329 of the Virginia Code is analogous to environmental cleanup statutes and claims that section 32.1–329 "gives rise to continuing regulatory obligations to which any provider participating in the Program must contractually agree to abide." However, the interests addressed in the cases involving environmental cleanup statutes are not interests that could be released with a money satisfaction. For example, the interests at issue in *In re Borne Chemical Co.,* 54 B.R. 126 (Bankr. D.N.J.1984), a case cited by DMAS, were obligations originating under the New Jersey Environmental Cleanup Responsibility Act (ECRA). As the court described:

> ECRA requires an "owner ... of an industrial establishment planning to sell ... operations" to notify the DEP in writing within five days of the execution of an agreement of sale. ECRA further requires that within 60 days before transfer of title, the owner or operator must submit either a negative declaration to the DEP stating that there are no environmental hazards, or file a cleanup plan. Upon approval of the plan, the owner must post a bond or other security guaranteeing performance of the cleanup and remains responsible for implementing the plan unless the purchaser assume that responsibility.

> ECRA further provides that the DEP or transferees can void the sale if the transferor fails to comply with any provision of the Act, and that penalties of up to $25,000 per day may be imposed on those who fail to comply. The Act also provides that obligations imposed by the Act are intended to "constitute continuing regulatory obligations imposed by the state" and are not to be considered as liens or claims dischargeable in bankruptcy.

*In re Borne Chemical Co.,* 54 B.R. at 128. Obviously, the interests could not be satisfied with a money judgment. *See Torwico Elecs., Inc., v. New Jersey Dep't of Envtl. Protection (In re Torwico Elecs., Inc.),* 8 F.3d 146, 150–51 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994) (holding debtor's obligation to clean up hazardous waste on property was not claim under Bankruptcy Code; state didn't have right to payment but instead had right to force debtor to comply with existing environmental laws).

In the case at issue, DMAS can be compelled to accept a money satisfaction of its interest. In fact, DMAS concedes that it has no derivative claim against a subsequent purchaser if debtor pays $1,700,000.00 in depre-

ciation recapture. The court cannot conceive a clearer circumstance of an interest, which is not a lien, that is subject to sale under § 363(f)(5).[4]

## EQUITABLE POWER TO ENJOIN

 Pursuant to § 105(a) of the Bankruptcy Code:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). Accordingly, § 105 authorizes this court to enjoin any act to collect an interest in the bankruptcy estate in contravention of a court order to sell the property free and clear of *all interests* under § 363(f)(5). As this court has already determined, DMAS's interest is subject to § 363(f), and the property can be sold free and clear of that interest. Upon sale of the property, DMAS's interests vest in the sale proceeds of the property, and the state agency no longer has an interest in the property. At that point, DMAS does not have a claim against Emporia.

Based on the conflict between 11 U.S.C. § 363(f) and section 32.1–329 of the Virginia Code, the court will exercise its equitable power and award the injunction.

In addition, there are many factors which weigh in favor of the court granting the injunction. Debtor filed a good faith bankruptcy petition at the suggestion of DMAS.[5] The sale price is greater than the appraised value of the property. Emporia is unable to consummate the sale for the price set out if DMAS is able to collect its claim from Emporia. There are no other prospective purchasers. Thus, if the sale does not go forward, debtor will likely have to convert to chapter 7. Conversion of this case to chapter 7 will likely cause closure of the nursing home facility, and the closure of the facility will result in the involuntary discharge of those residents from the facility.

In addition, the Commonwealth of Virginia has placed a legislative moratorium on the construction of any new nursing home beds or expansion of any existing nursing home facilities until June 30, 1996, unless expressly excepted pursuant to Va.Code Ann. § 32.1–102.3:2. Thus, the patients would have to be transferred to other facilities which are at least thirty miles away. And, ironically, if the injunction is denied and debtor is forced to convert to chapter 7, DMAS will not recover the $1,700,000.00 in depreciation recapture.

Accordingly, the court will enter an order enjoining DMAS from seeking depreciation recapture from Emporia once the property has been sold free and clear of DMAS's interest pursuant to 11 U.S.C. § 363(f)(5). Plaintiffs are directed to submit an order consistent with this opinion.

A separate order will be entered.

---

4. The court's analysis under § 363(f)(5) is limited to those instances where the interest is not a lien. Whether the sale could proceed under § 363(f)(5) if the interest was a lien is not currently before me.

5. The court is sympathetic to DMAS's concern that owners of nursing homes may file bankruptcy merely to avoid the depreciation recapture requirement of § 32.1–329. However, under such circumstances, it is likely that the case would be dismissed for bad faith.