**In re SHENANDOAH REALTY PARTNERS, L.P., t/a Shenandoah Manor of Clifton Forge, Debtor.**

**The Commonwealth of Virginia Department of Medical Assistance Services, Appellant,**

**v.**

**Shenandoah Realty Partners, L.P., t/a Shenandoah Manor of Clifton Forge, et al., Appellees.**

**Civil Action No. 5:00MC00002.**

United States District Court, W.D. Virginia, Harrisonburg Division.

May 1, 2000.

508

*MEMORANDUM OPINION*

MICHAEL, Senior District Judge.

The appellants are appealing the October 6, 1999 order of the bankruptcy court overruling all but one of the objections of the Department of Medical Assistance Services ("DMAS") to confirmation of the modified second amended plan of reorganization ("Ascend's plan") proposed by Ascend HealthCare ("Ascend"). The appellants invoke jurisdiction pursuant to 28 U.S.C. § 158(a).

I.

DMAS is the largest unsecured creditor of Shenandoah Realty Partners (the "Debtor"). The Debtor owns and operates a 60–bed nursing home and a 35–bed adult care facility in Virginia and has a Medicaid provider agreement for this nursing home with DMAS. The Debtor is licensed by the Commonwealth of Virginia and subject to the regulatory authority of DMAS pursuant to Title 32.1 of the Virginia Code. The Virginia Medicaid Program provides medical assistance to the medically and financially needy in cooperation with the federal government and is administered by DMAS. Medicaid providers such as the Debtor render medical services to qualified recipients and are compensated for their services through Virginia's reimbursement plan. The depreciation of a nursing home's tangible assets is one of the costs reimbursable to providers under Virginia's Medicaid Program. The Debtor received reimbursement for its depreciation pursuant to provisions of Virginia's Administrative Code. On May 30, 1996, the Debtor

filed a petition for reorganization under Chapter 11 of Title 11 on the United States Code in the U.S. Bankruptcy Court for the Western District of Virginia (the "bankruptcy court").

DMAS's claim against the Debtor arises from a statutory provision that allows for depreciation recapture by DMAS upon the sale or transfer of a nursing home. *See* VA.CODE ANN. § 32.1–329(A). This statute further provides that DMAS may recapture such depreciation from the transferee of the Debtor's nursing home upon the Debtor's failure to reimburse DMAS in full. *See* VA.CODE ANN. § 32.1–329(C). Pursuant to the statute, DMAS holds an unsecured claim against the Debtor contingent upon the sale (for gain) of the Debtor's real and tangible property, comprising its licensed nursing home, for repayment of depreciation paid to the Debtor. DMAS's claim increases daily and is approximately one million dollars ($1,000,000). However, on March 28, 1999, the General Assembly of Virginia enacted Chapter 728, which repeals Section 32.1–329, effective July 1, 2000. Therefore, DMAS will be unable to claim a right to recapture depreciation from any "sale" or "transfer" which occurs after July 1, 2000.

The Debtor never filed a plan of reorganization in this proceeding. Instead, three separate entities proposed plans for purchase of the Debtor's business. Ascend's plan of reorganization was accepted by the bondholders with the number of votes necessary to fulfill the voting requirement of 11 U.S.C. § 1126(c). Ascend's plan (which is actually its modified second amended plan of reorganization) proposes to purchase all of the assets of the Debtor, thereby rendering the Ascend plan a liquidating plan of reorganization. It has been offered for confirmation under 11 U.S.C. § 1129. In addition to providing for the purchase of all of the assets of the Debtor, the Ascend plan proposes to pay only a portion of the DMAS claim,[1] and to permanently enjoin DMAS from pursuing, post-confirmation, the Debtor, the Debtor's principals, or Ascend for collection of any unpaid claim of DMAS. The plan also gives the Debtor and the principals of the Debtor a discharge of any claim that DMAS might have post-confirmation.

On October 9, 1999, a confirmation hearing was held on the plan proposed by Ascend. In an order dated October 16, 1999, the bankruptcy court overruled all of DMAS's objections to confirmation of the plan except for DMAS's argument that the plan unlawfully discharged the Debtor under 11 U.S.C. § 1141(d)(2) and (3). On October 18, 1999, DMAS filed an appeal of the October 16, 1999 order. On December 1, 1999, Ascend filed a motion to dismiss the appeal. On March 7, 2000, this court dismissed the appeal on the basis that it was an interlocutory appeal and not ripe for consideration. On March 8, Judge Krumm held a hearing on the confirmation of the Ascend Plan which was confirmed by the bankruptcy court by order dated March 10, 2000. On March 15, DMAS filed a "Motion Seeking a Stay Pending the Appeal of the Confirmation Order" with the bankruptcy court. On March 20, 2000, the bankruptcy court denied DMAS's Motion for Stay Pending Appeal, but granted a temporary stay until April 3, 2000. On March 23, DMAS filed a motion for stay pending its appeal to this court. By order *nun pro tunc*, this court extended the temporary stay until the hearing on April 17.

## II.

As of this date, the appeal has not been filed with the court. However, in addition to DMAS's Motion to Stay Pending Appeal, DMAS also has filed a Motion to Expedite the Appeal. This opinion addresses DMAS's pending motions.

### A. *Stay Pending Appeal*

Bankruptcy Rule 8005 states that a stay pending appeal should be

---

1. The Plan proposes to allot $200,000 to a fund for all of the unsecured creditors.

granted only to "protect the rights of all parties in interest." Rule 8005 permits the filing of a motion for stay with the district court, if a party is not granted relief from the bankruptcy court. This court's decision in the case of *In re Skinner*, 202 B.R. 867 (W.D.Va.1996), provides the framework for analysis of DMAS's request for a stay pending appeal. "A party seeking a stay must show: (1) that he will likely prevail on the merits of the appeal; (2) that he will suffer irreparable injury if the stay is denied; (3) that other parties will not be substantially harmed by the stay; and (4) that the public interest will be served by granting the stay." *Id.* at 868 (quoting *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir.1970)). If the harms strongly favor DMAS, then the court need only find that DMAS has raised substantial and serious questions. If the harms are evenly balanced, DMAS must make a stronger showing of success on the merits. *See id.* at 869. The party moving to stay has the burden on each of these elements. *See In re Charter Co.*, 72 B.R. 70, 72 (Bankr.M.D.Fla.1987).

As the court emphasized during the hearing, the test to determine whether a stay is proper is substantially similar, though not exactly the same, to the test for preliminary injunction. As such, there is a potential for mischief in granting a stay because the court, "acting on an incomplete record, [must] order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir.1994). Thus, " 'the danger of a mistake' in this setting 'is substantial.' " *Id.* (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)).

*1. Appellant's Irreparable Harm*

■■ DMAS alleges that it will suffer irreparable injury if the Confirmation Order is not stayed as the sale of the Debtor's assets to Ascend could be consummated. Consequently, the appeal would be rendered moot as DMAS contends that such action would result in the issuance of a permanent injunction enjoining DMAS from taking any steps to seek repayment from Ascend. However, "[i]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm." *In re 203 North LaSalle Street Partnership*, 190 B.R. 595, 598 (N.D.Ill. 1995); *see also In re Kent*, 145 B.R. 843, 844 (Bankr.E.D.Va.1991); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr.M.D.Fla.1987).

■ Further, at the present moment, DMAS does not have a lien on any property of the Debtor. Rather, only upon the transfer of the nursing home does DMAS possess a right to recapture from the seller or the purchaser the depreciation payments DMAS has made to the nursing home.[2] The statute upon which DMAS relies will stand repealed on July 1, 2000. Under its Plan, Ascend has 90 days plus a 45 day extension in which to close. Thus, in conformity with its plan, Ascend may proceed to conduct its due diligence and makes its decision to close after July 1, 2000. Assuming that Ascend follows such a schedule,[3] DMAS would not have a claim for recapture.

■ Further, DMAS's argument is that if it is successful on appeal it would then be able to recapture its depreciation payments upon the sale of the nursing home. As the bankruptcy court noted during the confirmation hearing, DMAS's efforts would not result in any money to the state,

**2.** At the hearing, DMAS argued that the right to recapture depreciation accrues upon a mere agreement of the parties to sell the nursing home. However, a closer look at Section 32.1(e) evinces that the agreement between the parties must include the transfer of title. *See* Va.Code Ann. § 32.1 (" '[S]ale or transfer' shall mean any agreement between the transferor and the transferee by which the

former ... transfers to the latter the title and possession of the property").

**3.** In the Debtor's and Ascend's Memorandum in Opposition to Motion to Expedite, the appellees indicate that the sale would not occur until after July 1, 2000.

but will merely drive the purchase price down to the point where there would be no recapture liability. *See In re WBQ Partnership,* 189 B.R. 97, 108 (Bankr.E.D.Va. 1995) (recognizing that DMAS currently possesses a contingent interest because the right of recapture depends on whether a gain is realized from the sale which would be unlikely if property is sold without "free and clear" language as the price would have to be discounted to account for the liabilities that the buyer would face as a result of acquiring the asset). Were this to happen, the bondholders would no longer be willing to give up value to the other unsecured creditors. Thus, DMAS is not harmed by denial of a stay because DMAS will not recover anything even if the confirmation order is overturned on appeal.

### 2. Harm Suffered by Other Parties

■ DMAS alleges that the Debtor is presently functioning at a profitable level with its current management which, under the Ascend Plan, will continue to manage the Debtor after confirmation of the Plan and consummation of the sale to Ascend. From this information, DMAS infers that the Debtor's ability to continue in business will not be jeopardized while an appeal is pending. This inference neglects to take into account that it may be several years before the sale of the nursing home closes as DMAS has indicated its intention to appeal the confirmation order up to the United States Supreme Court. The appellees contend that these are uncertain times in the health care industry with many of the largest nursing home providers in bankruptcy. During the appeal, economic conditions or Medicaid reimbursement policies may change and Ascend may lose interest in the nursing home and decide not to close. Were this to happen the bondholders would not be able to receive a

payment equaling 93% of what was owed to them, the unsecured creditors would not be able to participate in a $200,000 fund, and the patients and employees of the nursing home would risk a shutdown of the facility as the bondholders seek to satisfy their lien. As the appellants asserted during the hearing, the fact that Ascend may decide not to buy the nursing home is mere speculation. However, in weighing what little harm DMAS might suffer if the stay is not granted against the potential harm to the creditors, employees and patients, the harm to the latter would be more severe.

### 3. Likelihood of Success on Appeal

As the balance of the harms favors the appellees, DMAS must make an promising showing of the likelihood of success on appeal to stay the proceedings. In an effort to accomplish this task, DMAS alleges several grounds for reversal on appeal including certain constitutional and jurisdictional issues.

#### (a) Eleventh Amendment.

■ The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[4] Accordingly, the Eleventh Amendment substantiates that each state is a sovereign entity and that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). In the wake of the Supreme Court's decision in *Seminole*

4. Though the court is dubious about the applicability of the Eleventh Amendment to the present case, the court, nonetheless, will undertake consideration of this issue. *See State of Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777, 786 (4th Cir.1997) (stating, "The confirmation order ... was not entered in a suit 'against one of the United States' filed by a private party," in a case where the state challenged a liquidating trust created pursuant to a confirmed plan).

*Tribe,* the United States Court of Appeals for the Fourth Circuit declared that the abrogation of state sovereign immunity contained in 11 U.S.C. § 106 is unconstitutional and ineffective. *See In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140 (4th Cir.1997). Therefore, "in the absence of a constitutional authorization, it lies solely within a state's sovereign power to waive its immunity voluntarily and consent to federal jurisdiction." *Id.* at 1147. To determine whether a state has waived its immunity, the court must first examine state law to determine whether the state has specifically and clearly waived its Eleventh Amendment immunity, and then to federal law to determine whether the state's filing of a proof of claim effected a waiver of immunity in the particular proceeding. *See id.* at 1148–49.

DMAS alleges that the issuance of an injunction prohibiting DMAS from recapturing depreciation violates DMAS's immunity. To support this contention DMAS cites numerous cases decided by Federal district courts in Virginia. However, these cases are distinguishable from the present case. In the cases cited by DMAS, the various courts found that the state did not waive its immunity in the federal system when the state waived immunity in state proceedings, *see Jacobs v. College of William and Mary,* 495 F.Supp. 183, 190 (E.D.Va.1980), when the state statutes did not express clear legislative intent constituting waiver, *see McConnell,* 829 F.2d at 1329, or when the state neglected to take action against the opposing party, but was nonetheless named as a party, *see Croatan Books, Inc. v. Virginia,* 574 F.Supp. 880, 883 (E.D.Va.1983). These characteristics, particularly the latter, are not found in the present case. Rather, in the present case, DMAS actively participated in the bankruptcy proceeding. DMAS filed a proof of claim in this bankruptcy case. Two separate counsel each filed a Notice of Representation on behalf of DMAS. Counsel for DMAS appeared on behalf of DMAS and addressed the bankruptcy court at various times throughout the case. Counsel for DMAS voiced objections to certain actions before the bankruptcy court and advised the bankruptcy court on DMAS's position regarding amounts that it would accept in satisfaction of its depreciation recapture claim. Counsel for DMAS also participated in litigation in the bankruptcy case, including propounding discovery, taking depositions of witnesses and moving to exclude witnesses. In sum, DMAS's actions are inconsistent with its claim of immunity. Therefore, this case is more comparable to the case cited by the appellees, *Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir. 1997).

In *Antonelli,* the state challenged a liquidating trust created pursuant to a Chapter 11 debtors' confirmed plan and sought recovery of state and county transfer and recordation taxes. The state argued that it was immune from the applicability of the bankruptcy court's order by reason of the Eleventh Amendment. *See id.* at 779. The Fourth Circuit held that "the power of the bankruptcy court to enter an order confirming a plan, including a provision interpreting § 1146(c), derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Id.* at 787. As such, if the state wishes to challenge a bankruptcy court order, it will have to submit to federal jurisdiction. *See id.* However, a state choosing to challenge an order forgoes any challenge to the federal court's actions. "While forcing a state to make such a choice may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment." *Id.* Because DMAS actively participated in the bankruptcy proceeding, it may not now claim immunity from the bankruptcy court's order.

Moreover, in a recent decision in the Western District of Virginia, a court deter-

mined that, "If a state files a proof of claim it waives its sovereign immunity." *University of Virginia v. Robertson*, 243 B.R. 657, 662 (W.D.Va.2000). The court, citing *Antonelli*, went on to state that "the Eleventh Amendment does not bar certain bankruptcy actions asking the court to, in effect, block the state from possessing an asset that it does not presently possess." *See id.* at 665. Accordingly, the fact that DMAS filed a proof of claim supports the conclusion that DMAS waived its sovereign immunity. Additionally, because this case does not require DMAS to forfeit an asset presently in DMAS's possession, but rather enjoins DMAS from ever possessing the asset, the injunction imposed by the bankruptcy court is proper. Therefore, the likelihood of DMAS succeeding on its sovereign immunity claim is not great.

(b) *The Section 1141(d)(3) Exception.*

▇▇▇ DMAS contends that 11 U.S.C. § 1141(d)(3) is an exception to 11 U.S.C. § 1141(c) so that the proposed sale cannot take place free and clear of claims and interests. Because Ascend's Plan contemplates a liquidation of the Debtor, 11 U.S.C. §§ 1141(c) and (d)(3) apply in this case. These sections provide:

(c) *Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners of the debtor.*

(d)(3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. §§ 1141(c) and (d)(3) (emphasis added). DMAS asserts that the plain language of 1141(d)(3) necessitates a finding that property dealt with in a liquidating plan cannot be transferred to Ascend free and clear of claims and interests. However, Judge Krumm interpreted the plain language of Section 1141(c) to provide that assets of the debtor may be sold free and clear of liens, but that the debtor would not receive a discharge under a liquidating plan. This interpretation appears to be the more appropriate one, especially when considering the legislative history. "Paragraph (3) [1141(d)(3)] specifies that the debtor is not discharged by the confirmation of a plan if the plan is a liquidating plan and if the debtor would be denied discharge in a liquidation under section 727." H. Rept. No. 95–595 to accompany H.R. 8200, 95th Cong. 1st Sess. (1977) p. 418, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6374.

Moreover, under DMAS's interpretation, a debtor corporation never could sell its assets free and clear of liens under a plan of liquidation because it always would satisfy the requirement of Section 1141(d)(3). The untenable nature of DMAS's position is clear when Section 363 is brought into view. DMAS admits that Section 363 provides for a sale free and clear of liens without the strictures that DMAS would attach to Section 1141(c). However, although the plan process under Chapter 11 with its disclosure and voting provisions provides greater protections to creditors than a sale under Section 363, DMAS would have this court believe that under the less protective provisions of Section 363 all of the assets of a corporate debtor could be sold free and clear of liens, but that such a sale is not available under a confirmed liquidation plan. For the foregoing reasons, DMAS is not likely to succeed on this claim based on its interpretation of the statute.

## (c) *Statutory Basis to Enjoin DMAS.*

■ DMAS contends that the bankruptcy court lacks authority to grant the injunction provided for in the Ascend Plan prohibiting DMAS from collecting its depreciation recapture from Ascend. To support the contrary conclusion, Ascend relies on *In re WBQ Partnership,* 189 B.R. 97 (Bankr.E.D.Va.1995) and *In re P.K.R. Convalescent Ctrs., Inc.,* 189 B.R. 90 (Bankr.E.D.Va.1995). As DMAS properly notes, *WBQ* and *P.K.R.* held that DMAS's claim in those cases constituted an "interest in property" and that a debtor's property could be sold, upon motion by the debtor-in-possession or trustee, free and clear of such interest pursuant to 11 U.S.C. § 363(f). *See WBQ,* 189 B.R. at 105–07; *P.K.R.,* 189 B.R. at 94. Those courts held that because Virginia Code § 32.1–329 was in actual conflict with 11 U.S.C. § 363(f), the Supremacy Clause of the United States Constitution warranted exercise of the court's equitable powers under 11 U.S.C. § 105 to implement a permanent injunction against DMAS to carry out the provisions of Title 11. *See WBQ,* 189 B.R. at 110; *P.K.R.,* 189 B.R. at 96. DMAS asserts that Ascend's reliance on these cases is misplaced because the courts found a conflict between the Virginia depreciation recapture provision and 11 U.S.C. § 363(f), whereas the present case involves 11 U.S.C. § 1141(c).

Though the statutes may be different, the principles behind them are the same. In *WBQ* and *P.K.R.,* the courts determined the statutes to be in conflict because the Virginia statute created an interest in or charge on the property; whereas, the federal statute authorized the property to be sold "free and clear" of such interests. *See WBQ,* 189 B.R. at 108; *P.K.R.,* 189 B.R. at 94. Similar to Section 363(f), Section 1141(c) contains a "free and clear" provision. Accordingly, Section 1141(c) is also in conflict with Virginia Code Section 32.1–329. As such, the holdings of *WBQ* and *P.K.R.* govern the case at bar; thus, the federal statute would preempt the state statute, thus creating a basis for enjoining DMAS from collecting its depreciation recapture claim from Ascend.

### (d) *Ascend Plan does not violate Virginia Law.*

DMAS asserts that the plan is forbidden by state law and thus cannot be confirmed pursuant to Section 1129(a)(3). The basis for this assertion is Virginia Code § 32.1–329. Because it has already been determined that this state statute is preempted by federal law, this argument also fails.

### (e) *Ascend Plan is feasible.*

DMAS also asserts that the bankruptcy court improperly found that the Ascend Plan was feasible. DMAS alleges that nothing in the Ascend Plan or disclosure documents evidences Ascend's ability to pay all administrative claims in full, including DMAS's administrative claim against the Debtor on the effective date of the Ascend Plan as required by 11 U.S.C. § 1129(a)(9). Further, DMAS contends that the plan should not be confirmed based on *In re Sis Corp.,* 120 B.R. 93 (Bankr.N.D.Ohio 1990), holding that "impermissible and unenforceable" discharge provisions contained in a liquidating plan render the plan infeasible. *See id.* at 96. However, this assertion depends on the finding that the Virginia law would not be preempted by the federal law. For the reasons mentioned above, DMAS would not succeed on the merits of this claim.

### (f) *Alteration of Applicable Regulatory Rate Structure.*

■ Pursuant to 11 U.S.C. § 1129(a)(6), a plan may not be confirmed unless:

> Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

Under Title 32 of the Virginia Code, DMAS has, and will continue to have, regulatory authority over the rates of the nursing home facility after confirmation of

Ascend's Plan. DMAS attempts to argue that enjoining collection of its preconfirmation depreciation recapture claim constitutes a post confirmation rate change. However, DMAS fails to cite to any rate provisions which would be changed as a result of confirmation of Ascend's Plan. The bankruptcy court apparently rejected this argument because DMAS introduced no evidence at the confirmation hearing to show that Ascend's plan would provide for a different rate structure than any other similarly situated and regulated entity in Virginia. This finding is not clearly erroneous as DMAS did not offer any such evidence at the confirmation hearing and Ascend's plan does not contain any provision which would require a rate change.

### (g) *Plan is Fair and Equitable to DMAS.*

Lastly, DMAS asserts that the Plan is not fair and equitable to the impaired classes not accepting the Plan. Once again, this assertion rests on reliance on Virginia Code Section 32.1–329. Therefore, this argument also fails.

### 4. *Public Interest*

■ DMAS asserts that the public interest will be served by granting the stay because if DMAS prevails on appeal, the Commonwealth will receive the funds to which it is entitled to satisfy its statutorily based right to recapture depreciation. DMAS further claims this income will be used to benefit the public. Moreover, DMAS contends that the public will be served when the courts resolve the issues of sovereign immunity and federal preemption involved in this case. However, as the appellees point out, one has to question how the public interest is furthered by granting a stay so that DMAS can proceed with an appeal based on a statute that stands repealed as of July 1, 2000. Moreover, DMAS will not receive any funds if successful on appeal. Rather, any new purchaser will calculate the purchase price to account for any liability for recapture. In such a case, the bondholders will lose almost $700,000, the unse-

cured creditors will receive nothing, and the state will receive nothing. In addition, if DMAS is permitted a stay pending appeal, Ascend will not be able to close in accordance with its contract and the patients and employees of the nursing home will be put at risk if Ascend walks away from the sale. Under these facts, it appears that the public interest would favor the denial of the stay.

### B. *Motion to Expedite Hearing*

■ DMAS seeks an expedited hearing on its appeal to preserve its claim against the Debtor and the transferee of the nursing home. DMAS asserts that it is necessary for this court to hear and decide the pending appeal prior to July 1, 2000 (when the statute's repeal would become effective) to avoid any possible loss of DMAS's claim. DMAS notes that all issues have been thoroughly briefed and reviewed by all parties because the previous appeal, on virtually identical issues, was recently dismissed by this court the day oral arguments on the appeal were to be heard. Thus, no party would be prejudiced by an expedited briefing schedule and hearing on appeal.

However, the Bond Trustee asserts that as of the filing of the motion to expedite, the time for the appellees to designate additional items for the record had not expired. Accordingly, the record on appeal will not be complete until the appellees submit their designation and the transcripts of any hearings are prepared and filed. Further, the speed at which an appeal is heard will not affect whether a transfer occurs prior to July 1, 2000. Even if this court were to decide the appeal prior to July 1 and DMAS were to prevail, DMAS still would not have a recapture claim if the Debtor's assets had not been transferred to Ascend by that date. Indeed, if the transfer does not occur until after July 1, 2000, DMAS's appeal will be moot and this court will have expended valuable resources. The appellees maintain that the sale will not

occur before July 1. Based on this fact and the consequences it brings about, it is not practical to expedite the appeal hearing.

## III.

It is important to note that the conclusions set forth herein are made on an incomplete record. As such, a full evidentiary hearing may change entirely the view of the court as to any of these issues. However, as it currently stands, the court does not find that DMAS is likely to succeed on the merits of its claims. Additionally, because of the detriment to the bondholders, employees and patients of the nursing home if the sale to Ascend is not completed, this court finds that the balance of harms favors the appellees. Further, as a decision on the merits of this case will not influence whether the sale of the nursing home will occur prior to July 1, 2000, the repeal date, it is not necessary for this court to undertake an expedited appeal. For the foregoing reasons, DMAS's motions for stay pending appeal and for an expedited appeal are denied.