## In re TAKEOUT TAXI HOLDINGS, INC., Debtor.

### No. 03–14555–RGM.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 2, 2004.

H. Bradley Evans, Jr., Redmon, Peyton & Braswell, L.L.P., Alexandria, VA, for Debtor.

James R. Schroll, Bean, Kinney & Korman, Arlington, VA, for Debtor Designee.

H. Jason Gold, Wiley, Rein & Fielding LLP, McLean, VA, pro se.

Joel S. Aronson, Ridberg, Sherbill & Aronson LLP, Bethesda, MD, for Trustee.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

THIS CASE is before the court the chapter 7 trustee's motion to sell substantially all of the property of the estate free and clear of all liens pursuant to § 363(f) of the Bankruptcy Code and for a determination of the secured status of Douglas C. Williamson. The court found that William-

son held a valid and enforceable lien. The evidence also revealed other liens, the total of which clearly exceeds the value of the assets proposed to be sold. The question presented is whether a sale free and clear of all liens under § 363(f) is appropriate. The court concludes that it is not and denies the motion.

### Liens

All of the assets sought to be sold are personal property. There are three financing statements of record. The first in time secures BA Capital Company, L.P. in the original principal amount of $1 million.[1] The trustee asserts that the BA Capital lien is unenforceable. He argues that the Texas statute of limitations is applicable and that enforcement of the note is now barred. The second in time secures separate notes of five individuals: Douglas C. Williamson, Martin Brody, John Holzgraefe, Mark J. Wishner and Michael A. Beschie. The third in time secures James R. Leininger.

Williamson's lien is in the principal amount of $75,000.00 together with interest through February 24, 2004, of $52,075.04. The BA Capital lien was subordinated to Williamson's lien which makes Williamson's lien first in priority. While the evidence supports the inference that Brody, Holzgraefe, Wishner and Beschie are also secured creditors, there was some evidence that suggests they were not properly identified in the security agreement and may, therefore, not be secured. The evidence is reasonably clear that they were intended to be secured. No one chal-

lenged Leininger's secured status. The principal amount of his note is $100,000.

Except for Williamson, no other secured creditor made an appearance. None consented or objected to the sale. No bar date was set for filing proofs of claims. None of the affected secured creditors filed a proof of claim.

The value of the property is substantially less than all recorded liens on the property. The initial proponents of the sale were franchisees of Takeout Taxi. They offered the trustee $20,000.[2] After the court held that Williamson had a lien on the property they indicated a willingness to bid more that Williamson's outstanding balance of $127,075.04, an increase of more than $100,000.

### Requirements for a Section 363(f) Sale

■ Section 363(f) is a powerful right available to a trustee. It permits a trustee to maximize the recovery from an asset without being unduly entangled at an early stage of the proceedings in controversies concerning the existence, validity and priority of liens and other interests in the property sought to be sold. It allows a trustee to quickly cut through the potential morass of such controversies, promptly sell the property for the best price available and resolve those controversies at a later date. This right, however, is not without its limitations or without protections for lienholders and others holding interests in the property. Section 363(f) states:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such proper-

---

1. The debtor listed Bank of America Capital Investors as holding two secured claims, the first in the original principal amount of $1 million and the second in the original principal amount of $500,000. The amount scheduled as now due was $2.4 million and $1 million, respectively. It was listed on Schedule D, "Creditors Holding Secured Claims,"

as wholly unsecured. No other creditors were listed on Schedule D.

2. The sale was originally noticed as a private sale to the franchisees. When Williamson objected and expressed an interest in purchasing the assets, the proposed sale was changed to an auction.

ty of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

█ The five conditions are in the disjunctive. Only one needs to be satisfied in order to be able to sell property free and clear of all liens and interests.

### Nature of Principal Assets Sought to be Sold

The principal assets sought to be purchased by the franchisees were the copyrights and intellectual property rights in certain software used by the debtor. The debtor created a system that allows third-party delivery of restaurant take-out orders, similar to a pizza delivery except permitting a much broader choice of foods and restaurants. The operation of the system relies on software named "Deliverynet." The software processes orders. The restaurants are given the order which is picked up and delivered by the franchisee. It also provides certain accounting and other functions. The franchisees assert that they cannot continue to operate without it.[3]

At the hearing, the franchisees asserted that the software situation was more complicated. They asserted that the software was created by Lane's Computer Solutions, Inc., but updated by the debtor. The current version incorporates parts from Lane's development and parts from upgrades not developed by Lane's.[4] Neither Lane's nor the debtor appears to have the right to use the most current version without the consent of the other. Lane's, according to the franchisees, has continuously made escalating demands for payment for the continued use of the software. Without the use of the software, the franchisees fear that they will be out of busi-

---

**3.** This case was filed on October 6, 2003. The offer was made on January 20, 2004.

**4.** The Statement of Financial Affairs states that Lane's was paid $12,000 a month for "software usage rights and monthly maintenance." Statement of Financial Affairs, Question 3. Schedule G, "Executory Contracts and Unexpired Leases," also lists Lane's. The description there is "Software contract for software systems used in running daily store operations for franchise and corporate units." Schedule G. The trustee sought a 60–day extension of his obligation to assume or reject the contract. He stated in his motion that "Debtor franchised the concept of a delivery service for restaurant food. Key to that concept was the use of a customized computer software package from Lane's Computer Solutions, Inc." Memorandum at ¶ 3. (Docket Entry 14). The motion was granted and the extended period expired on February 6, 2004. The trustee did not assume the contracts and they are now deemed rejected.

Schedule B, "Personal Property," lists the software as two assets. The first is described as "Takeout Taxi" interactive web ordering software integrated with current base software "Deliverynet." The second listing is "Takeout Taxi" software enhancements to current base software "Deliverynet." Both are listed with the value of "Unknown." The schedules also identify WINAIX Software Ltd., Co. which was responsible for new software development. Statement of Financial Affairs, Question 3 and Schedule G. According to the franchisees, Lane's owns much of the basic source code, but the debtor owns the upgrades. Lane's is responsible for operating the software system.

ness. The franchisees and the trustee argued that if the franchisees stopped doing business, the debtor's assets would quickly become worthless. The trustee and the franchisees urged that the debtor's assets be treated as perishable.

### Value of the Assets

There was no testimony as to the value of the assets sought to be sold. The debtor listed the value of its software and software enhancements on Schedule B, "Personal Property," as unknown. The petition, schedules and statement of affairs were signed by Williamson as chairman and chief executive officer. He was also the officer at BA Capital responsible for the debtor's account. On January 20, 2004, the franchisees offered the trustee $20,000 for all of the assets of the debtor, which included the rights to the software. The franchisees were the principal opponent's of Williamson's lien position. After the hearing on Williamson's secured status was concluded and the court ruled that Williamson held a valid lien in the amount of $127,075.04, the franchisees stated that they were prepared to bid competitively against Williamson.

### Procedural Matters

■ Strict compliance with procedural matters when presenting a motion to sell free and clear of liens and interests is especially important because the trustee is disposing of the secured party's collateral or a third party's interest in the property potentially without the consent of the secured party or the third party. The starting point for the required procedural steps is Federal Rule of Bankruptcy Procedure 6004. *See* 3 Collier on Bankruptcy, ¶ 363.06[11] (15th ed. revised, 2003). Rule 6004(a) addresses the required notice of a proposed sale not in the ordinary course of business. Subsection (c) designates a motion to sell free and clear as a contested matter and requires that the lienholders

and interest holders be served with the motion. Subsection (g) stays any order of sale for a period of 10 days after entry of the order, unless otherwise ordered.

Rule 9014 governs contested matters. Relief is requested by motion upon reasonable notice and an opportunity for a hearing. No response is required unless directed by the court. F.R.Bankr.P. 9014(a). Service of the motion is required to be in a manner provided in F.R.Bankr.P. 7004. Rule 7004(b)(1) permits an individual to be served by mailing a copy of the motion to the individual's dwelling house or usual place of abode or to the place where the individual regularly conducts a business or profession. A partnership may be served under Rule 7004(b)(3) by mailing a copy of the motion to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if required by law, by also mailing a copy to the partnership itself. There are additional modes of service available. *See* F.R.Bankr.P. 7004(a) and (b)(8).

Notice of the motion, which is different from the required service of the motion on the lienholders and the interest holders, is required to be given in accordance with F.R.Bankr.P.2002. *See Banks v. Sallie Mae Servicing Corporation (In re Banks)*, 299 F.3d 296, 301 (4th Cir.2002); *In re Boykin*, 246 B.R. 825, 828 (Bankr.E.D.Va. 2000). The address to which notices must be mailed may differ from the address to which the motion must be mailed in order to be properly served. *Cf.* F.R.Bankr.P. 2002(g) and F.R.Bankr.P. 7004(b).

■ In this case, the certificate of service for the motion recites that it was transmitted electronically only to the United States Trustee and counsel for the debtor. The certificate of service of the notice of the hearing reflects that the no-

tice of the hearing was mailed to Bank of America Capital Investors, Williamson, Brody, Besche and Leininger. It was not mailed to Holzgraefe or Wishner although both were listed as creditors on Schedule F, "Creditors Holding Unsecured Nonpriority Claims."[5] The motion is fatally flawed because of the lack of service on the secured parties. The mailing of the notice of the hearing does not cure the defect in service of the motion itself. Moreover, the notice was defective as well. At least two creditors were omitted from the mailing. In this instance they were two secured creditors whose interests were directly at stake.

The motion itself is inadequate. Most significantly, the trustee does not identify any secured creditor intended to be affected by the sale nor does he set forth any factual basis to support his conclusion that the liens are in bona fide dispute.

■ Due process under the Fifth Amendment requires that a secured party whose collateral is about to be sold free and clear of his lien be given fair notice of the intended action and an opportunity to be heard. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted); *Banks v. Sallie Mae Servicing Corporation (In re Banks)*, 299 F.3d 296, 302 (4th Cir.2002); *Piedmont Trust Bank v. Linkous (In re Linkous)*, 990 F.2d 160, 162 (4th Cir.1993).

*Mullane* revolved principally around the constitutional adequacy of service by publication but did address the issue of the content of the required notice. It stated that "[t]he notice must be of such nature as reasonably to convey the required information." *Id.* 339 U.S. at 314, 70 S.Ct. at 657. It continued:

> It would be idle to pretend that publication alone as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts. It is not an accident that the greater number of cases reaching this Court on the question of adequacy of notice have been concerned with actions founded on process constructively served through local newspapers. Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed. The chance of actual notice is further reduced when as here the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention. In weighing its sufficiency on the basis of equivalence with actual notice we are unable to regard this as more than a feint.

*Id.* 339 U.S. at 315–16, 70 S.Ct. at 658. Where service by publication is permissible, the published notice must reasonably identify the respondent and the nature of the claim.

■ In the context of a motion filed under § 363(f) service of the motion in accordance with Rule 7004 satisfies the

---

**5.** Wishner was identified as a shareholder but "listed as a precaution." Sch. F, Attachment

C.

first half of the requirement that interested parties be apprised of the pendency of the action. However, the motion served on the secured creditor must be sufficient to place the creditor on notice that his lien is at issue. The lien should be reasonably identified. The relief requested and the basis for the relief requested should be plainly stated. *In re Banks,* 299 F.3d at 302 ("due process entitles a student loan creditor to specific notice of the Debtor's intent to discharge any portion of the debt."); *In re Linkous,* 990 F.2d at 162–63 (adequate notice to affected secured creditor is prerequisite to according preclusive effect to confirmation order).

*Cen–Pen Corporation v. Hanson,* 58 F.3d 89 (4th Cir.1995) provides some insight into the adequacy of pleadings.[6] The Court of Appeals was troubled by the adequacy of the plan provision that was intended to effect the debtor's intention to void the secured creditor's lien. The court referred to it as "boilerplate language." *Id.* at 93. The provision, which appeared at the end of a multi-page plan, stated:

All claims to be allowed must be filed; to the extent that the holder of a secured claim does not file a proof of claim, the lien of such creditor shall be voided upon the entry of the Order of Discharge in this case.

*Id.* It was not conspicuous. It did not identify Cen–Pen. It did not alert Cen–Pen that it had or may have had a lien on any of the debtor's property. It did not specifically apprise Cen–Pen of the nature of the threat it faced.

A similar question was raised in *In re Linkous.* Piedmont Trust Bank, an allegedly undersecured creditor, received a summary of the chapter 13 plan and the bankruptcy court's notice of the plan. The plan provided that Piedmont's lien would be stripped down to the value of its collateral. Piedmont did not respond and subsequently moved to revoke confirmation of the plan. Piedmont admitted that it received actual notice of the plan, but argued that it did not receive adequate notice that the bankruptcy court would make a § 506 valuation at the confirmation hearing. The Court of Appeals stated:

[N]otwithstanding the recognized responsibilities of the creditor [to protect its rights], the debtor also must meet certain burdens. A debtor should inform the *secured* creditor of an intent to reclassify its claim into partially secured and partially unsecured status. Placing such a responsibility with the debtor is both logical and not unduly burdensome.

*Id.* at 163. The Court of Appeals affirmed the district court's finding that notice of the § 506 valuation motion and hearing was inadequate and that Piedmont's due process rights were violated. Confirmation was revoked as to the § 506 valuation and remanded for a valuation hearing.

■ Constitutional due process is not simply satisfied by properly placing a piece of paper in the hands of the respondent. The paper served must contain adequate information. The content must be reasonably calculated to put the respondent on notice. The person whose interests are sought to be affected should be identified. In this case, both the motion and the notice were designed for the general creditor body. Neither identified any individual secured creditor. The liens in jeopardy were not identified. Both reasonable identification of the creditors and their liens in issue are necessary elements of a proper

---

**6.** The Court of Appeals did not address this issue because it decided the case on other grounds. It held that the applicable chapter 13 plan provision was itself insufficient to divest a secured creditor of its lien because the debtor had failed to initiate a separate avoidance proceeding. *Cen–Pen,* 58 F.3d at 93.

motion. Absent notice that a secured creditor's lien is to be affected, the secured creditor may assume that his collateral will be sold subject to his lien or that he will be paid in full at closing. These possibilities pose different risks from releasing the collateral from the lien and transferring the lien to the proceeds of the sale.

■ Closely related to the failure to identify the secured creditors who are at risk and the challenged liens is the failure to assert sufficient grounds upon which relief may be granted. The trustee stated that he "questioned the validity of certain liens, and requests, therefore, that the sale be free and clear of liens, and that the liens attach to those proceeds." Memorandum at ¶ 3. (Docket Entry 28). The secured creditor is entitled to some information as to why the lien is challenged so that he may defend his interests appropriately. Merely reciting this conclusion does not suffice to apprise the secured creditor of the basis for that conclusion. Nor is it immediately clear that questioning the validity of a lien rises to the standard set out in § 363(f)(4), that there be a "bona fide dispute." This motion would not survive a motion under F.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted as incorporated into F.R.Bankr.P. 7012(b).[7]

### Satisfaction of Conditions for Sale Free and Clear

A trustee may sell property of the estate other than in the ordinary course of business under § 363(b). However, if a trustee also wishes to sell it free and clear of liens and interests, he must satisfy one of the five conditions enumerated in § 363(f). Those five conditions are set out above. The first four clearly do not apply to Williamson's lien. Applicable nonbankruptcy

law does not permit the sale of the collateral free and clear of his liens. He did not consent to the sale. The value of the collateral appears to be substantially lower than the aggregate value of all liens on the collateral. (His lien alone exceeded $127,000 while the franchisees offered only $20,000.) His lien was no longer the subject of a bona fide dispute.

■ The only subsection that may be applicable is subsection 5. Section 363(f)(5) permits a sale free and clear of any interest in the property if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." While it is generally true that a secured lender is only entitled to the payment of his lien and can be required to accept full payment in satisfaction of his lien, this subsection ought not be construed so broadly so as to become a sufficient basis to always permit the sale of any property subject to a security interest. Such a construction would consume subsections 2, 3 and 4. Subsection 3 envisions a secured lender being paid in full, preferably at closing, if the collateral is sold. It recognizes the bargained-for position of the secured lender and balances his right to dispose of the collateral for his benefit pursuant to the terms of the negotiated security agreement and the right of the trustee to dispose of the collateral for the benefit of all creditors of the estate pursuant to the Bankruptcy Code. If the trustee will pay the secured lender in full, the secured creditor cannot be heard to complain and the trustee may sell the collateral for the benefit of the unsecured creditors. However, if the sale of the collateral will result in a deficiency, the secured creditor generally should be able to dispose of it according to the security agree-

---

7. F.R.Bankr.P. 9014 does not make F.R.Bankr.P. 7012 applicable to contested matters. Rule 7012 is only applicable if separately ordered by the court.

ment. It is of no benefit to the unsecured creditors and, if the secured lender is to suffer a loss, he should ordinarily be permitted to suffer the loss at his own hands.[8]

■ If a secured creditor is not to be paid in full from a sale, he may consent to the sale by the trustee, or if there is a bona fide dispute as to the lien the trustee may sell the collateral over his objection. This is the balance Congress reached between the secured creditor and the trustee. It is inconsistent with an overly broad construction of § 363(f)(5). If a trustee has the authority to sell any property subject to a lien because the secured lender is only entitled to a single money satisfaction and can be compelled to accept such a satisfaction in return for the release of his lien, subsection 5 would consume subsections 2, 3 and 4 and upset the balance Congress intended. Such a broad construction would always enable a trustee to sell the collateral over the objection of the secured creditor for an amount insufficient to pay the secured creditor in full even when there is no bona fide dispute. Section 363(f)(5) has a different purpose. It is intended for interests other than typical monetary liens. *See, e.g., In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581 (4th Cir.1996)(sale of coal mine free and clear of debtors' obligations to benefits plan and fund under Coal Act); *WBQ Partnership v. Virginia Dep't of Medical Assistance Servs. (In re WBQ Partnership)*, 189 B.R. 97, 106–107 (Bankr.E.D.Va.1995) (Bostetter, C.J.) (sale of nursing home free and clear of Virginia's unsecured depreciation-recoupment interest), *P.K.R. Convalescent Centers v. Commonwealth of Virginia, Dep't of Medical Assistance Servs. (In re P.K.R. Convalescent Centers)*, 189 B.R. 90, 92–94 (Bankr.E.D.Va.1995) (Tice, J.) (sale of nursing home free and clear of Virginia's unsecured depreciation-recoupment interest). Thus, in this case, Section 363(f)(5) is not available to sell the property free and clear of Williamson's lien. *In re Canonigo*, 276 B.R. 257 (Bankr.N.D.Cal. 2002); *In re Beker Industries Corp.*, 63 B.R. 474 (Bankr.S.D.N.Y.1986); *but cf.* 3 Collier on Bankruptcy, ¶ 363.06[6][a] (15th ed. revised, 2003) (distinguishing a sale of property subject to a security interest in the ordinary course of business from a sale not in the ordinary course of business).

### *Curing the Defects*

■ After further discussions during a recess, Williamson consented to the sale of the collateral. There were, however, other defects. The first to be considered is Leininger's lien. Leininger was not properly served nor was his lien identified in the motion. The lien was uncontested at the hearing. Leininger did not object to the sale, however, he did not consent to the sale either. Section 363(f)(2) requires actual consent. The failure of a secured creditor to respond to a motion to sell free and clear is not consent. In contract law, acceptance of an offer is normally not inferred from silence because there is normally no obligation to accept or even respond to an offer. Silence may be significant and may result in a § 363(f) sale if there is a sufficient allegation, for example, that the secured creditor's lien is

---

**8.** There is, of course, the possibility that the secured creditor will not act promptly or will conduct an improper or tainted sale. This could increase the unsecured deficiency claim to the prejudice of the other unsecured creditors. Such a sale is against the secured creditor's own interests. However, if there are other assets in the estate that result in a distribution to the creditors, the trustee may defend against an improper or tainted deficiency claim if the secured lender is culpable in some manner for the deficiency or the extent of the deficiency. The trustee may, in this manner, protect the other unsecured creditors from such conduct.

subject to a bona fide dispute or that the creditor consented to the sale.[9] In such cases, the failure to respond may be taken as an admission that there is a bona fide dispute or that the creditor actually consented to the sale and the collateral may be sold under § 363(f)(4). Generally, silence is not consent sufficient to permit a sale under § 363(f)(2).[10] Here, without proper service and adequate information in the motion to apprise Leininger of the issues to be presented to the court, silence signifies nothing.

During the recess, the parties reached Leininger's attorney who was not present at the hearing. They were unable to reach Leininger himself. The trustee, Williamson and the franchisees were satisfied that Leininger would consent to the sale and urged the court, in light of the perishable nature of the assets, to allow an auction subject to Leininger's consent. His consent and acceptance of service would cure all problems: the failure to serve him with the motion to sell free and clear, the deficiencies with the motion itself, and the absence of satisfaction of one of the five required conditions under § 363(f). However, it introduced its own problem—whether an auction sale could proceed prior to receiving his consent.

There is a difference between holding an auction sale before all the secured creditors are before the court and have consented to the sale with the expectation they will consent after the sale and holding an auction sale after all secured creditors are before the court and have consented. When everyone is before the court, the playing field is level. Everyone can decide

where his economic interests lie and bid accordingly, knowing that the sale will be over in a few minutes. The final sales price should reflect the collective judgment of the bidders of the best and highest price for the asset at that time. However, if one creditor must consent the following day, after the auction results are known, he has a special advantage, in effect, the unilateral power to nullify the prior sale. An auction cannot normally be held in those circumstances because the bidding would probably be affected. In this case, all of the parties were in a position to evaluate the situation and make an independent judgment as to whether to proceed. The trustee had no further stake in the matter. It was unlikely that the final bid price would be enough to pay both Williamson and Leininger. There would be no net proceeds for unsecured creditors. Leininger, the absent party, was fully protected. He could evaluate the situation and make his own informed decision after the auction. If he concluded that he should have participated in the auction, he could withhold his consent. Williamson and the franchisees stated that their bidding would not be affected by Leininger's absence. They were the only ones practically affected and assumed the risks inherent in these circumstances. When all the parties are protected or have full knowledge of the circumstances, the estate is not detrimentally affected, third parties are not detrimentally affected, and the asset is truly perishable, an auction can proceed despite the less than ideal circumstances. This is what the parties urged.

---

**9.** Actual consent does not arise simply from an assertion that silence will be deemed to be consent. *Cf.* 11 U.S.C. § 102(1) defining "after notice and a hearing."

**10.** Similarly 11 U.S.C. § 1129(a)(10) requires the affirmative vote of at least one impaired

class of claims if any class is impaired under a proposed chapter 11 plan. *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 501 (4th Cir. 1992). A class that does not vote does not accept the proposed plan. 11 U.S.C. § 1126.

The difficulty is that those conditions while met with respect to Leininger, were not met as to four other secured creditors who were not before the court: Brody, Holzgraefe, Wishner and Besche. None was served with the motion. Two did not receive a copy of the notice of the proposed sale. To complicate matters even more, they were secured by the same security agreement and financing statement as Williamson which raises issues of their priority and the extent to which Williamson can credit-bid. Section 363(k) permits credit-bids in general, but they may be denied for cause. If Brody, Holzgraefe, Wishner or Besche were before the court, they might object to Williamson credit-bidding because, if they are of equal priority, there would be no cash proceeds from the sale available for distribution to them.

The trustee asserted that Brody, Holzgraefe, Wishner and Besche were not properly perfected because they were not identified in the security agreement. It appears that the parties intended to be secured by the security agreement were to be listed on an addendum. The addendum was not presented to the court. Williamson presented a signature page he signed and, he testified, was the intended addendum identifying him. Similar pages were sent to the other four. Whether they were signed or not is unclear, but each was named as a secured party in the financing statement. Since they were not before the court, they had no opportunity to defend their positions.[11]

Because of the procedural posture of the case, there are simply no protections that can be crafted that would protect all the parties if an auction were held subject to the absent parties' later consent.

11. Similarly, BA Capital was not before the court and had no ability to protect its posi-

*Conclusion*

 A sale free and clear of liens and interests is a powerful tool available to the trustee in proper circumstances. It is not intended to be used routinely. In order to protect all interested parties, strict compliance with the procedural requirements must be observed and the trustee must prove that one of the five conditions set out in § 363(f) is applicable. Here this was not done and despite the assertion that the asset would perish and shortly be of no value, the trustee's motion must be denied.